1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    CHAI LAO,

11              Plaintiff,                    No. CIV S-06-2714 EFB

12         vs.

13    MICHAEL J. ASTRUE,                      ORDER
      Commissioner of Social Security,[1]
14
                  Defendant.
15    _____/

16        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17    ("Commissioner") denying plaintiff's application for Supplemental Security Income under Title

18    XVI of the Social Security Act ("Act").  For the reasons that follow, plaintiff's motion for

19    summary judgment is denied, and the Commissioner's cross-motion for summary judgment is

20    granted.  The Clerk is directed to enter judgment for the Commissioner.

21    **I. BACKGROUND**

22        Plaintiff, born February 23, 1962, initially applied for disability benefits on May 9, 2000,

23    alleging disability since January 9, 1997, due to arthritis, gout, pain in knees, ankles, wrists,

24    _____

25        [1]  On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social
      Security, replacing Jo Anne B. Barnhart, the original defendant herein.  Pursuant to 42 U.S.C.
      § 405(g) and Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in this
26    action.

knuckles, shoulders, elbows, and back; weakness and dizziness; difficulty concentrating, sleeping, and eating; hearing voices and seeing things; and , anger, depression and anxiety. Administrative Record ("AR") 61, 72, 238.  The application was denied initially and upon reconsideration.  AR 47-57.  As set forth below, plaintiff filed a subsequent application for SSI benefits in 2002, which was denied.  Both the initial and subsequent applications have been the subject of litigation for more than eight years.

Plaintiff's first hearing on his initial application was held before administrative law judge ("ALJ") Antonio Acevedo-Torres on February 19, 2002.  AR 21-44.  Following that hearing, ALJ Acevedo-Torres issued a written decision finding plaintiff not disabled.[2]  AR 10-25.  The

---

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401, *et seq*.   Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382, *et seq*.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) and 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  *Id.*

Appeals Council denied plaintiff's request for review, and plaintiff appealed the Commissioner's decision to the district court. On February 12, 2004, the assigned magistrate judge recommended granting plaintiff's motion for summary judgment, finding that the ALJ erred in concluding that plaintiff could perform heavy work. AR 334-46. The district judge adopted those findings and recommendations in full, and the case was remanded for further development regarding plaintiff's exertional capacity, and as appropriate, to obtain the testimony of a vocational expert. *Id.*

In the meantime, plaintiff filed a subsequent application for SSI benefits in June 2002. AR 361-64. That application was also denied initially and on reconsideration. An administrative hearing was held on August 28, 2003, before administrative law judge L. Kalei Fong, who, on November 26, 2003, issued a decision finding that plaintiff was not disabled. AR 618-37, 289-300. On April 28, 2004, following plaintiff's request for review, the Appeals Council vacated that decision and remanded the case back to ALJ Fong for further proceedings. AR 321-23. Specifically, the Appeals Council ordered that the record be developed further with respect to plaintiff's recurrent episodes of gout and related needs for medically-necessary assistive devices. It also ordered further development of the record regarding plaintiff's residual functional capacity, including consideration of his non-exertional limitations. *Id.* Accordingly, a subsequent hearing was held on November 19, 2004, before ALJ Fong, who on February 22, 2005, again found plaintiff not disabled. AR 260-67, 638-62.

On April 22, 2005, the Appeals Council issued an order remanding the initial application to a new ALJ pursuant to the district court's March 24, 2004, remand order. AR 349-50. The Appeals Council took note of plaintiff's subsequent application, and found that action on it was rendered "duplicate" in light of the order remanding plaintiff's initial claim for another hearing. *Id.* Accordingly, the Appeals Council ordered the ALJ to associate the claim files and to issue a new decision regarding the consolidated claims. AR 349-50. The Appeals Council specifically directed the new ALJ to obtain additional evidence concerning plaintiff's impairments,

3

1    reevaluate his RFC, and if warranted, obtain evidence from a vocational expert.  *Id.*

2         On May 23, 2006, following a hearing before ALJ Mark C. Ramsey, plaintiff was again

3    found not disabled.  AR 237-51.  Specifically, the ALJ made the following findings:

4        1.   The claimant has not engaged in substantial gainful activity
5            since the alleged onset of disability.

6        2.   The claimant's gout, osteoarthritis and depression, not
        otherwise specified are considered "severe" based on the
7            requirements in the Regulations 20 CFR § 416.920(c).

8        3.   These medically determinable impairments do not meet or
        medically equal one of the listed impairments in Appendix
9            1, Subpart P, Regulation No. 4.

10       4.   The undersigned finds the claimant's allegations regarding
        his limitations are not totally credible for the reasons set
11           forth in the body of the decision.

12       5.   The claimant has the residual functional capacity to lift and
        carry twenty pounds frequently, claimant should avoid
13           climbing and balancing but could occasionally crouch and
        crawl.  The claimant also retains the ability to understand,
14           remember and carry out simple one or two-step
        instructions.  The claimant can relate and interact with
15           others with no public contact and he can adapt to stresses
        common to a normal work environment.  The claimant also
16           can maintain concentration, attention, persistence and pace
        and he can maintain regular attendance.  In other words, the
17           claimant retains the ability to perform simple, unskilled
        work.

18       6.   The claimant has no past relevant work (20 CFR §
19           416.965).

20       7.   The claimant is a 'younger individual between the ages of
        18 and 44'(20 CFR § 416.963).

21       8.   The claimant has a 'marginal education' (20 CFR §
22           416.963).

23       9.   The claimant has the residual functional capacity to
        perform a significant range of sedentary work (20 CFR §
24           416.967).

25       10.  Although the claimant's exertional limitations do not allow
        him to perform the full range of sedentary work, using
26           Medical-Vocational Rule 201.24 as a framework for
        decision-making, there are a significant number of jobs in

the national economy that he could perform.  Examples of such jobs include work as a lampshade assembler (DOT #739.684-094); table worker (DOT# 739.687-182); pharmaceutical assembler (DOT #559.687-014) and mounter (DOT #976.684-018).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through February 21, 2005 (20 CFR § 416.920(g)).

AR 250-51.

On September 29, 2006, the Appeals Council notified plaintiff that it had not timely received his exceptions to the ALJ's decision, which caused the ALJ's decision to become the final decision of the Commissioner.  AR 227-29.  Plaintiff therefore initiated this action.

## II.  ISSUES PRESENTED

In his motion for summary judgment, plaintiff essentially alleges four errors in the Commissioner's decision.  First, plaintiff alleges that the ALJ improperly assessed the medical evidence by failing to credit the opinions of his treating physician, treating psychiatrist, and various consultative examiners.  Second, plaintiff asserts that the ALJ improperly assessed his residual functional capacity ("RFC").  Third, plaintiff alleges that the ALJ failed to include all of his limitations in the hypothetical posed to the vocational expert.  Finally, plaintiff asserts that the ALJ erred by failing to ask the expert whether her testimony conflicted with the Dictionary of Occupational Titles.

## III.  LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

(9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

*Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)

(citations omitted).  "Where the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

*Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

**IV.  ANALYSIS**

A.  Assessment of Medical Opinions and RFC Assessment

Plaintiff asserts that the ALJ improperly rejected the opinions of his treating physician,

treating psychiatrist, and several of the consultative examiners.  According to plaintiff, these

alleged errors resulted in a flawed RFC assessment.

The weight given to medical opinions depends in part on whether they are proffered by

treating, examining, or non-examining professionals.  *Lester*, 81 F.3d at 830.  Ordinarily, more

weight is given to the opinion of a treating professional, who has a greater opportunity to know

and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.

1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81

F.3d at 831.  By contrast, a contradicted opinion of a treating or examining professional may be

rejected for "specific and legitimate" reasons, that are supported by substantial evidence.  *Id.*, at

830.  While a treating professional's opinion generally is accorded superior weight, if it is

contradicted by a supported examining professional's opinion (e.g., supported by different

independent clinical findings), the ALJ may resolve the conflict. *Andrews*, 53 F.3d at 1041

(citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

The record in this case contains a host of medical opinions due to the consolidated claims

and the numerous hearings thereon. The record shows that the ALJ considered all such opinions,

and the court discusses his treatment of them, first, as they relate to plaintiff's exertional

abilities, and second, with respect to his non-exertional limitations.

1. Plaintiff's Exertional Abilities

The ALJ found that plaintiff had the RFC to perform a significant range of unskilled,

sedentary work. He determined that plaintiff could lift and carry twenty pounds frequently,

could crouch and crawl occasionally, but should avoid climbing and balancing. As set forth

below, this assessment was supported by substantial evidence in the record and was based on the

proper legal standards.

The ALJ did not err by giving little weight to the contradicted opinions of plaintiff's

treating physician, Dr. Wu-Hsiung Su, M.D. He found Dr. Su's opinions to be unsupported by

objective findings and inconsistent with other evidence in the record. AR 209-12, 520-21, 244.

In his October 2001 assessment, Dr. Su opined that plaintiff could only sit, stand, and walk, for

less than 4.6 hours per day, and could not bend, squat, climb, crawl, or use his hands for repeated

grasping, pulling, pushing, twisting, or fine manipulations. AR 210. The ALJ gave this opinion

little weight because it was unsupported by concurrent medical findings, including x-rays or

other diagnostic testing, and was otherwise unexplained. AR 244. Although plaintiff did have

an x-ray on September 3, 1999, it indicated only mild degenerative changes in the left ankle with

some soft tissue swelling, and did not otherwise support the extensive limitations assessed by Dr.

Su. AR 158.

The ALJ also rejected Dr. Su's 2003 assessment that plaintiff could only occasionally lift

and carry five to ten pounds, walk or stand for less than one hour without interruption, and sit

1  less than one hour without interruption.  AR 244, 519-20.  Dr. Su listed the "medical findings"

2  supporting this assessment as "pain and weak."  AR 519.  Pain and weakness are symptoms, not

3  objective medical findings.  *See* 20 C.F.R. § 404.1529; *see also In re Heckler*, 751 F.2d 954, 955

4  n.1 (8th Cir. 1984) ("pain is a symptom").

5  The ALJ's rejection of such extreme limitations in light of Dr. Su's failure to support

6  them with objective medical findings was not in error.  These were "specific and legitimate

7  reasons" when considering the contradictory opinions in the record, as well as the ALJ's adverse

8  credibility determination with respect to plaintiff's subjective complaints.  *See* AR 247-48

9  (noting numerous inconsistent statements and exaggerations by plaintiff).

10  Rather than accept Dr. Su's unexplained opinion, which appears to have been based

11  largely on plaintiff's subjective complaints, the ALJ relied on the October 31, 2004, assessment

12  of examining physician, Dr. Karen Chee, M.D.  Dr. Chee performed a comprehensive medical

13  examination of plaintiff, and expressed doubt about the severity of his symptoms.  In particular,

14  she noted that he used a crutch on the wrong side.  *See* AR 243, 582-83; *see also* AR 247 (noting

15  that nothing in the record indicated a prescription for an assistive device).  Dr. Chee also noted

16  that the tests concerning plaintiff's motor strength were "inconsistent" as he showed "hesitancy

17  with initial good strength," which then "broke away."  AR 582.  Based on her examination, Dr.

18  Chee opined that plaintiff could lift and carry twenty pounds frequently, walk for two hours and

19  sit without limitation in an eight-hour workday.  AR 243, 582-83.[3]

20  The state agency physicians assessed similar limitations, AR 489-98, as did consultative

21  examining physician, Dr. Rashid Elahi, M.D.  AR 426-30.  The ALJ accorded "significant

22  weight" to the opinion of Dr. Elahi, who examined plaintiff on August 18, 2002.  AR 243, 426-

23  30.  Dr. Elahi opined that during periods where plaintiff's gout was controlled, he would have no

24

25  [3] Although Dr. Chee's notations on an attached form indicate that plaintiff could stand or
   walk for less than two hours, the ALJ resolved the ambiguity by adopting the more detailed,
26  narrative description in her written assessment.  AR 243, 588.  *See Andrews*, 53 F.3d at 1039
   (ALJ is responsible for resolving ambiguities).

1    limitations in his ability to sit, stand or walk.  AR 429.  Even during gout attacks, Dr. Elahi

2    opined that plaintiff could still lift and carry twenty pounds, but may need an assistive device to

3    take the weight off his foot.  *Id.*  Dr. Elahi noted that plaintiff refused to undergo several

4    procedures designed to test his range of motion in his back, hip, and knees, and he expressed

5    doubt as to plaintiff's claims that he continuously had gout and needed crutches for four-and-a-

6    half years.  AR 428-29.  He noted that gout was episodic in nature, should last only for about a

7    week at a time, and that plaintiff should otherwise be pain-free between attacks.  He further

8    remarked that plaintiff was not on any preventive medicine for gout, and should consult his

9    doctor about getting such a prescription.  *Id*.

10        This was consistent with the testimony of medical expert, Dr. Loren T. De Wind, M.D.,

11   who testified at the hearing held on November 19, 2004, before ALJ Fong.[4]  AR 643-53.  Dr. De

12   Wind testified that he had reviewed plaintiff's records, and opined that plaintiff had recurrent

13   attacks of gout because he did not consistently take his medication as prescribed, and because he

14   was not taking Allopurinol, which if taken faithfully, should prevent gout attacks altogether.[5]

15   AR 645-52.

16        The record supports Dr. De Wind's observation about plaintiff's failure to take his

17   medications faithfully.  *See, e.g.,* AR 552 (noting that plaintiff's "treatment for both his

18   psychiatric symptoms and gout remain compromised by inadequate adherence to prescribe

19

20       [4]  At the request of the Social Security Administration, medical experts review a
21   claimant's medical records and give an expert opinion as to the extent of the impairment.  20
     C.F.R. §§ 404.1527(f)(2)(iii); 416.927(f)(2)(iii); *see Richardson*, 402 U.S. at 408 (a medical
22   expert is a neutral advisor used primarily in complex cases for explanation of medical problems
     in terms understandable to the layman-examiner).

23       [5]  *See* The Merck Manual of Diagnosis and Therapy ("Merck Manual"), 301 (18th ed.
24   2006) (the usual reason gout does not improve with treatment is noncompliance with medication
     and/or undertreatment by physicians); *see also* MedicinePlus, A Service of the U.S. National
25   Library of Medicine and the National Institutes of Health, at
     http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682673.html (Allopurinol may take
26   some time to take effect, but with faithful adherence, prevents gout attacks) (last updated June
     26, 2008).

medications"); AR 571, 648-49 (plaintiff admitting that he forgets to take his medicine); AR

570, 575 (admitting he stopped taking all medicine and started taking a "gout medicine" from

Thailand); AR 438 (reporting inconsistently taking his gout medication).  Based on his review of

the record and his experience as physician, Dr. De Wind opined that plaintiff could sit six hours

in an eight-hour day, and could stand for up to two hours with breaks for sitting if he was not

having an acute attack of gout.  AR 650.  Again, he opined that with faithful adherence to his

medications, such attacks could be prevented altogether.  *See Warre v. Comm'r of the SSA*, 439

F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with

medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Indeed, the record showed that plaintiff was pain-free between attacks.  *See, e.g.*, AR 678

(testified he was pain-free between attacks), AR 133-36 (exam performed during pain-free

period), AR 151 (reporting gout pain greatly lessened).

Here, Dr. De Wind's opinion was consistent with those of examining physicians Drs.

Elahi and Chee, as well as the state agency physicians.  *See Morgan*, 169 F.3d at 600; *Andrews*,

53 F.3d at 1041 (the opinions of a nonexamining, testifying medical advisor may serve as

substantial evidence when supported by other substantial evidence in the record).  The ALJ's

ultimate RFC determination as to plaintiff's exertional abilities is properly based on those

opinions, and as set forth above, finds substantial support in the record.

2.  Plaintiff's Ability to Meet Mental Demands of Work

Plaintiff also argues that the ALJ improperly discounted the opinions of his treating

psychiatrist, Dr. Alan Koike, M.D., as well as the opinions of consultative psychiatric examiners,

Drs. Bobo, Adeyemo, and Behniwal.  As a result, he argues, the ALJ improperly assessed his

non-exertional limitations with respect to the mental demands of work.

The ALJ concluded that as a result of plaintiff's depression, he had limitations in his

ability to perform complex or detailed job tasks, and was limited to simple, unskilled work.  AR

244.  Specifically, he found that plaintiff retained the ability to understand, remember and carry

out simple one or two-step instructions, and could relate and interact with others, but should

avoid public contact.  The ALJ further found that plaintiff could maintain regular attendance, as

well as concentration, attention, persistence and pace, and could adapt to the stresses common to

a normal work environment.  *Id.*  This assessment of plaintiff's RFC with respect to the mental

demands of work is supported by the record.

Although plaintiff argues that the ALJ erred by ignoring the "longitudinal history" of his

treatment by treating psychiatrist, Dr. Koike, the record shows that the ALJ concurred with Dr.

Koike's assessment, to the extent one was offered.  In an August 8, 2003, assessment, Dr. Koike

opined that plaintiff had chronic depression, and noted a "rule out" secondary diagnosis of post-

traumatic stress disorder ("PTSD").  AR 538-41; *see also* AR 544, 546, 570-72, 574 (supporting

treatment notes).  He noted plaintiff's poor adherence to his medications, and opined that

plaintiff had only moderate limitations in his ability to relate to others, to perform activities of

daily living, and to maintain his personal habits.  AR 539-40.  He further commented that

plaintiff's "depression and gout interact. When the pain from the gout is worse, he is more

depressed."  AR 539.   He found that plaintiff's "degree of constriction of interests" was

moderately severe, but declined to give an opinion regarding plaintiff's ability to perform in a

work setting.  AR 541.  He wrote that such an opinion "exceed[ed] scope of practice and [was]

contraindicated due to therapeutic considerations."  *Id.*

Dr. Koike's comments regarding plaintiff's moderate limitations are consistent with the

ALJ's ultimate RFC assessment, which included limitations to simple, repetitive tasks and

limited public contact.  Moreover, the ALJ noted that Dr. Koike's treatment notes from 2004

revealed a GAF score of 60, which the ALJ found to be "consistent with only moderate

limitations in functioning" including "a limitation to simple tasks with simple instruction with no

contact with the public." [6]  AR 574, 245.  Indeed, a GAF score of 60 indicates only moderate

_____

[6]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness."  American Psychiatric Association: *Diagnostic*

1  symptoms and moderate difficulty in social, occupational, or school functioning.  *See* f.n. 6.

2  Plaintiff argues that the ALJ erred by failing to comment on Dr. Koike's later treatment

3  notes, which indicated a lowered GAF score and a confirmed diagnosis of PTSD.  Plaintiff

4  argues that these later treatment notes obligated the ALJ to obtain an updated RFC assessment

5  from Dr. Koike.  *See* Pl.'s Mot. for Summ. J. and P. & A. in Supp. Thereof ("Pl.'s Br."), 60:9-

6  61:3.

7  While Dr. Koike did continue to treat plaintiff throughout 2004 and 2005, his treatment

8  notes did not reveal significant changes that required clarification or otherwise affected

9  plaintiff's RFC.  *See* AR 570-74, 611-17; *see Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir.

10  2001) (no duty to develop record further where the evidence is unambiguous and the record is

11  adequate).  Although Dr. Koike assigned a lower GAF score of 55 to plaintiff in early 2005 (AR

12  614), that score is within the same range as the earlier score.  *See* f.n. 6.  Further, although Dr.

13  Koike eventually made a conclusive diagnosis of PTSD rather than "rule out" PTSD, the

14  progress notes reveal no change in the course of treatment and little to no change in prescribed

15  medications.  *See* AR 611-15.  Although Dr. Koike increased plaintiff's dosage of Prozac on one

16  occasion, the record is far more replete with notations of  plaintiff's consistent failure to take his

17  medications as prescribed, if at all.  AR 611-15; *see also* AR 432 (showing that by August,

18  plaintiff still had not picked up medications prescribed in April).  Furthermore, Dr. Koike's

19  decision to conclusively diagnose plaintiff with a secondary diagnosis of PTSD appears to be

20  based solely on plaintiff's reports of nightmares about his friend's death during the war in Laos.

21  *See* AR 614.  Interestingly, Dr. Koike's notes from 2001 indicate that plaintiff reported having

22  no depression or unhappiness prior to contracting gout.  AR 223.  Indeed, he indicated that prior

23  to gout, he had no problems, was happy, saw his life as normal and had no complaints.  AR 223.

24

25  *and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision, 2000) ("DSM IV-TR").
    A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech,
26  occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g.,
    few friends, conflicts with peers or co-workers).  *Id.*

1   These notations aside, there is no indication that plaintiff's nightmares or PTSD affected his

2   functional abilities.  *See Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996) (claimant has the

3   burden of proving that an impairment prevents him from working).  Indeed, Dr. Koike's progress

4   notes during this later period match almost precisely those from his 2003 assessment.  That is, he

5   observed that plaintiff's "mood fluctuates with flare-ups of his gout and other physical

6   symptoms."  AR 614, 539.

7        The same is true with regard to the change in diagnosis from "depression" to "major

8   depression."  Dr. Koike's notes during the period in which he diagnosed plaintiff with "major

9   depression" do not differ significantly from earlier notes.  If anything, they illustrate plaintiff's

10  continued failure to take his medication as prescribed, despite reports that when he did take it, it

11  helped.  *See* AR 611, 615.  Finally, even if the ALJ had contacted Dr. Koike for another

12  assessment, it is highly unlikely that it would have been helpful in determining plaintiff's work-

13  related limitations, since Dr. Koike refused to comment on those matters in 2003.  AR 541.

14       The ALJ considered Dr. Koike's opinion and treatment notes, and found them generally

15  consistent with the majority of other evidence in the record.  He found that they supported his

16  ultimate RFC determination, and the record bears this out.  There was no error in the ALJ's

17  treatment of Dr. Koike's opinion, and any failure to re-contact Dr. Koike was harmless.  *See*

18  *Mayes*, 276 F.3d at 460 (no duty to develop where record is adequate); *see also Curry v.*

19  *Sullivan*, 925 F.2d 1127, 1129 (9th Cir.1990) (harmless error analysis applicable in judicial

20  review of social security cases).

21       Plaintiff argues that the ALJ also improperly discounted the observations of consultative

22  examiner, Dr. Jerry Bobo, M.D.  However, the ALJ's ultimate RFC determination is largely

23  consistent with Dr. Bobo's assessment.  Dr Bobo examined plaintiff in September 2000, and

24  opined that plaintiff could perform simple, repetitive tasks, accept instructions from supervisors,

25  and perform work activities on a consistent basis.  AR 139, 251.

26  ////

1    Like Dr. Bobo, the ALJ ultimately concluded that plaintiff could remember and carry out

2    simple instructions and perform simple, unskilled work.  AR 251.

3    The ALJ, however, gave little weight to Dr. Bobo's "doubts" about plaintiff's ability to

4    attend work and deal with stress without "interruptions from his psychiatric condition."  AR 139,

5    245.  The ALJ discounted those limitations because Dr. Bobo's opinion was based, in part, on

6    inaccurate information provided by the plaintiff.  AR 245.  For example, plaintiff told Dr. Bobo

7    that he had not worked since he arrived in the United States, although the record indicates he had

8    several jobs after arriving here.  AR 25, 81,138, 245, 373.  The ALJ also noted that plaintiff told

9    Dr. Bobo that his impairments prevented him from driving altogether, despite evidence in the

10   record that plaintiff had a driver's license and could, and did, drive.  *See* AR 245, 138, 89, 544,

11   676.  Given the inaccurate background information provided by plaintiff, and the finding that

12   plaintiff was less than credible, the ALJ did not err by according less weight to Dr. Bobo's

13   opined limitations.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (free to

14   disregard opinion premised on subjective complaints where plaintiff is not credible).

15   Similarly, the ALJ rejected the opinion of consultative psychiatrist, Dr. Adegoke

16   Adeyemo, M.D., as inconsistent with the record.  AR 245, 422-25.  Dr. Adeyemo opined that

17   plaintiff was incapable of performing simple or complex tasks, and would not be able to interact

18   with co-workers or deal with stress encountered in a competitive work environment.  AR 425.

19   The ALJ noted that Dr. Adeyemo's opinion was based solely on the August 16, 2002,

20   examination, and was made without reference to relevant medical records.  AR 422.  In

21   particular, the ALJ noted that Dr. Adeyemo accepted plaintiff's statements that he suffered from

22   hallucinations and multiple suicide attempts, even though contemporaneous progress notes

23   indicated no such delusions.  AR 245, 213-26, 432-36.  Indeed, progress notes from plaintiff's

24   treatment at Sacramento County Adult Mental Health Services reveal that he reported no

25   hallucinations or delusions, and had intact high cognitive functioning.  AR 225, 213-26.  The

26   record also shows that plaintiff made inconsistent statements regarding suicide attempts.  While

14

he told Dr. Adeyemo that he had attempted suicide multiple times, he told Dr. Behniwal that he only made one such attempt.  AR 422, 594.  Whether or not plaintiff actually ever attempted suicide is debatable.  He told the doctor at the Sacramento County mental health clinic that he once "asked [his] children to get gun" when his pain was at its worse, but that they hid it from him.  He also reported that he had also "asked [*sic*] children to bring him kitchen knife."  AR 223.  Furthermore, treatment notes from the clinic consistently indicate a lack of suicidal ideation, and show that plaintiff reported that any "suicidal ideation" resolved when he was not in extreme pain.  AR 213-26.  Because Dr. Adeyemo's opinion was based almost entirely on plaintiff's subjective complaints and statements, and lacked the context of plaintiff's contradictory treatment records, the ALJ rejected the opinion.  These were legitimate reasons for doing so.  *See Tonapetyan*, 242 F.3d at 1149.

Similarly, the ALJ rejected the limitations indicated on a form completed by consultative examining psychiatrist, Dr. Mandeep Behniwal, M.D.  AR 592-98.  Dr. Behniwal examined plaintiff on November 8, 2004, and offered a narrative opinion in addition to the form.  Given the inconsistency between the form and the narrative report, the ALJ resolved the ambiguity by accepting the narrative discussion of plaintiff's limitations, which he found to be generally consistent with Dr. Koike's findings, as well as those of the state agency physicians.

In the narrative report,  Dr. Behniwal opined that plaintiff retained the ability to perform simple, repetitive tasks, and could accept instructions from supervisors as well as interact with coworkers and the public.  AR 597, 246.  He found plaintiff only moderately limited in his ability to maintain regular attendance, complete a normal workweek, and deal with the usual stress encountered in the work force.  *Id*.

On the accompanying form, Dr. Behniwal indicated that plaintiff had no useful ability to complete a normal workday or perform work activities without special supervision.  AR 246, 592.  He also indicated that plaintiff had only a "fair" ability to function (i.e., able to perform satisfactorily only some of the time) in several areas, due to low energy, pain and irritability.

15

AR 246.  Again, the ALJ discounted these limitations in light of their inconsistency with the narrative report.  Further, to the extent these limitations were based on plaintiff's subjective complaints, they were properly discounted in light of the ALJ's adverse credibility finding.  The ALJ noted this, remarking that plaintiff appeared at the exam in a wheelchair, claiming he could not walk or perform any activities himself.  AR 246.  The ALJ correctly noted that the record contradicted such claimed limitations and contained no prescription for a wheelchair.  AR 247-48.  Dr. Behniwal did not have the benefit of records confirming this, nor was he aware of plaintiff's consistent failure to take his medications as prescribed.

Based on the foregoing, the court finds that the ALJ gave legitimate reasons for rejecting the more restrictive opinions regarding plaintiff's non-exertional limitations.  The ALJ found that plaintiff had the RFC to understand, remember, and carry out simple instructions, maintain concentration, attention, persistence and pace, and adapt to stresses common to a normal work environment.  AR 251.  The ALJ further found that plaintiff could maintain regular attendance, and could relate and interact with others, but should avoid contact with the public.  *Id.*  This determination was supported by the properly supported portions of opinions rendered by Drs. Bobo, Koike, and  Behniwal, as well as the state agency physicians.  *See* AR 486-518.  As such, it was supported by substantial evidence and should not be disturbed.[7]

_____

[7] Plaintiff's cursory argument that the RFC determination is undermined by the ALJ's alleged failure to "include all of Mr. Lao's nonexertional physical and mental impairments, symptoms, and limitations" at step two of the sequential evaluation, is not well-taken.  *See* Pl.'s Br., 64:2-8.  This argument ignores the function of step two as a gatekeeping mechanism to dispose of groundless claims.  Once a plaintiff prevails at step two, regardless of which impairment is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step all other alleged impairments and symptoms that may impact her ability to work.  *See* 42 U.S.C. § 423(d)(2)(B).  Here, plaintiff prevailed at step two.  The relevant inquiry then becomes whether the ALJ properly considered the functional limitations of all medically determinable impairments at the remaining steps.  *See Smolen*, 80 F.3d at 1290 (if one severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis) (citing 20 C.F.R. § 404.1523); *see Burch v. Barnhart*, 400 F.3d 676, 682-82 (9th Cir. 2005) (ALJ's failure to find claimant's obesity severe at step two was harmless error where it was considered in determining claimant's RFC).  As set forth herein, the ALJ satisfied his burden and based his findings on substantial evidence.

1          B.  Hypothetical Question Posed to Vocational Expert

2          Plaintiff next asserts that the ALJ failed to include all of his limitations in the

3   hypothetical posed to the vocational expert.  In particular, plaintiff seems to argue that the ALJ

4   should have included in the hypothetical the limitations indicated on the form completed by Dr.

5   Behniwal (i.e., notations that plaintiff had only "fair" functionality in carrying out instructions,

6   interacting with others, etc.).  *See* AR 592-93.  However, as set forth above, the ALJ properly

7   rejected those limitations.

8          Plaintiff asserts that "because the ALJ failed to credit all [his] impairments and credible

9   limitations, he was free to exclude them from serious consideration.  Consequently, neither the

10  ALJ's RFC finding nor the hypothetical posed to the VE included any of these limitations as

11  required by 9th Circuit and Social Security law."  Pl.'s Br., 68:1-6.  By this statement, plaintiff

12  seems to acknowledge the appropriateness of excluding discredited limitations from inclusion in

13  the RFC assessment and in the hypothetical posed to the expert.  This is curious in light of

14  plaintiff's decision not to challenge the ALJ's adverse credibility finding.  *See* AR 247-48.

15  Indeed, plaintiff asserts in a footnote that such a challenge is "unnecessary" in light of the other

16  alleged errors.  *See* Pl.'s Br., 63:23-28.  By not challenging that determination, plaintiff has

17  waived any argument that plaintiff's discredited complaints should have been the basis for a

18  hypothetical.  *See Martinez v. Astrue*, No. 05-17265, 261 Fed. Appx. 33, 35 (9th Cir. Nov. 9,

19  2007) (citing *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

20         In any event, the ALJ's hypothetical to the expert reflected his RFC determination, which

21  as set forth above, was supported by substantial evidence.  Specifically, the ALJ asked the

22  vocational expert for sedentary jobs involving simple, unskilled work with limited public

23  contact.  AR 685-86.  Despite the ALJ's finding that plaintiff could speak English, *see infra*, he

24  also asked for jobs that did not require plaintiff to speak English.  *Id*.  The expert identified

25  several jobs that plaintiff could do with those limitations – table worker, lampshade assembler,

26  pharmaceutical assembler, and hand mounter.  AR 686.  The ALJ asked the expert whether a

1  person with moderate limitations in his ability to deal with work stresses, and to consistently

2  attend work and perform work activities could still do those jobs.  AR 687-88.  The expert

3  opined that such a person could do those jobs, because although there may be some difficulties,

4  he would not be precluded from performing them altogether.  *Id.*

5       This was an appropriate hypothetical based on the ALJ's ultimate interpretation of the

6  evidence.  The ALJ was not required to include limitations that he found to be unsupported by

7  substantial evidence in the record.  *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989)

8  (ALJ is not bound to accept limitations that are not supported by substantial evidence); *Embrey*

9  *v. Bowen*, 849 F.2d 418, 422-23 (9th Cir. 1988) (hypothetical that ultimately serves as the basis

10 for the ALJ's determination must be supported by substantial evidence).  Hypothetical questions

11 posed to a vocational expert must set out all the substantial, supported limitations and restrictions

12 of the particular claimant.  *Magallanes*, 881 F.2d at 756.  Here, the ALJ's hypothetical satisfied

13 that requirement.

14      C. No Conflict Between Vocational Expert's Testimony and DOT

15      Finally, plaintiff argues that the ALJ erred by failing to ask the vocational expert if her

16 testimony conflicted with the Dictionary of Occupational Titles.  *See* The United States Dept. of

17 Labor, Employment & Training Admin., *Dictionary of Occupational Titles* (4th ed. 1991),

18 ("DOT").  Specifically, plaintiff argues that his "virtual illiteracy in the English language" would

19 preclude him from performing the identified jobs, each of which the DOT defines as having a

20 "level one" language requirement.  He argues that the ALJ's failure to inquire about the conflict

21 between the expert's testimony (i.e., that he could do each job without speaking English) with

22 the DOT's description (requiring "level one" English for each job).

23      In *Massachi v. Astrue*, 486 F.3d 1149 (9th Cir. 2007), the Ninth Circuit held that the ALJ

24 must determine whether a conflict exists between an expert's testimony and the DOT, and that if

25 it does, he "must then determine whether the vocational expert's explanation for the conflict is

26 reasonable and whether a basis exists for relying on the expert rather than the Dictionary of

1   Occupational Titles." *Id.*, at 1153.  The Court qualified that holding, noting that failure to ask

2   about a conflict is harmless where there is no conflict, or where "the vocational expert . . .

3   provided sufficient support for her conclusion so as to justify any potential conflicts."  *Massachi*,

4   486 F.3d at 1154, n.19.

5          Here, the ALJ's failure to inquire about the conflict was harmless because there was no

6   conflict, as the record shows plaintiff has sufficient English skills to perform the identified jobs.

7   Under the DOT guidelines, "level one" language development entails the ability to recognize

8   2,500 two- or three-syllable words, compare similarities and differences between words, print

9   simple sentences and speak simple sentences.  *See* DOT, Vol. II, App. C, Scale of General

10  Education Development (GED), Language Development, Level 1.  Plaintiff's contention that his

11  virtual illiteracy would preclude him from performing any of the identified jobs is untenable.  A

12  social security disability applicant is not per se disabled because of illiteracy.  *Pinto v.*

13  *Massanari*, 249 F.3d 840, 845-47 (9th Cir. 2001).  Following plaintiff's rationale, not a single

14  illiterate disability applicant would be qualified for any of the jobs listed in the DOT.  Moreover,

15  the record supports a finding that plaintiff satisfies the identified language requirement.

16          Plaintiff testified at the January 19, 2006, hearing that he could read and speak some

17  English.  AR 669.  He testified at the hearing in February 2002, that he had taken English classes

18  for three years when he came to California.  AR 24-30; *but see* AR 670 (testifying at another

19  hearing that he studied English for one year).  The ALJ also noted that plaintiff had passed the

20  U.S. citizenship test, which requires an applicant to read, write, speak and understand words in

21  ordinary usage in English.  The ALJ noted that plaintiff met none of the exceptions for waiver of

22  this requirement.  AR 249, 675-76.  Further, the ALJ noted plaintiff's previous testimony that

23  when he worked as a dishwasher, he was able to respond to instructions in English.  AR 249,

24  671.

25          Based on this and other evidence, the ALJ did not find plaintiff's contention of illiteracy

26  to be credible.  AR 248-49.  Indeed, he specifically concluded that the record supported a finding

of basic literacy.  AR 249.   As discussed above, plaintiff has not challenged the ALJ's
credibility determination.  Even though the ALJ did not ask the vocational expert to explain why
she believed plaintiff could perform the identified jobs without speaking English when the DOT
ascribes those jobs a "level one" language requirement, such failure was harmless.  There was
sufficient evidence in the record for the ALJ to conclude that plaintiff possessed such low level
English abilities.

**V.  CONCLUSION**

In conclusion, the court finds that the ALJ's decision is fully supported by substantial
evidence in the record and based on the proper legal standards.  Therefore, IT IS ORDERED
that:

1.  Plaintiff's motion for summary judgment is denied;

2.  The Commissioner's cross-motion for summary judgment is granted; and,

3. The Clerk is directed to enter judgment in the Commissioner's favor.

DATED:  August 15, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE